## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MCKESSON MEDICAL-SURGICAL MINNESOTA SUPPLY INC., a Minnesota corporation,<br><br>       Plaintiff,<br><br>v.<br><br>THRIVE SKILLED PEDIATRIC CARE, LLC, a Delaware limited liability company; and SUMMIT PARTNERS, L.P., a Delaware limited partnership,<br><br>       Defendants. | Case No. 24-cv-00172-MN<br><br><br>**SECOND AMENDED COMPLAINT** |

## SECOND AMENDED COMPLAINT

Plaintiff McKesson Medical-Surgical Minnesota Supply Inc. ("Plaintiff" or "McKesson"), by its undersigned counsel, as and for its Second Amended Complaint (the "Complaint"), against Defendants Thrive Skilled Pediatric Case, LLC ( "Thrive") and Summit Partners, L.P. ("Summit", with Thrive collectively "Defendants"), alleges and states as follows:

### PARTIES

1.     McKesson is a corporation duly organized and existing under the laws of the State of Minnesota with a principal place of business at 9954 Mayland Drive, Suite 4000, Richmond, Virginia 23233.

2.     McKesson is informed and believes, and based thereon alleges, that Thrive was, at all times relevant herein, and is a Delaware limited liability company, with a principal place of business at 101 Edgewater Drive, Suite 110, Wakefield, Massachusetts

01880. Upon information and belief, each of Thrive's members are citizens of Massachusetts. Thrive can be served through its registered agent for service, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801; or wherever it may be found.

3.    McKesson is informed and believes, and based thereon alleges, that Summit was, at all times relevant herein, and is a Delaware limited partnership, with a principal place of business at 222 Berkeley Street, 18th Floor, Boston, Massachusetts 02116. Upon information and belief, Summit's general partner is Summit Master Company, LLC, a Delaware limited liability company. Upon information and belief, the managing members of Summit Master Company, LLC are citizens of Massachusetts. Summit can be served through its registered agent for service, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801; or wherever it may be found.

4.    McKesson is informed and believes and thereon alleges that at all times relevant hereto each of the Defendants were the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of each other and were at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of McKesson's rights and the damages to McKesson proximately caused thereby.

5.    McKesson is informed and believes and thereon alleges that Summit operated Thrive as an alter ego/single economic entity, and is liable for each of the herein

SECOND AMENDED COMPLAINT

described breaches and violations of law. Summit, through its managing directors, exercises control and direction over Thrive. Such control was maintained over the operations, financial decisions and business decisions with respect to Thrive and Thrive's subsidiaries (the "Subsidiaries") to the detriment of Thrive and its creditors, such as McKesson. McKesson is informed and believes and thereon alleges that Summit was responsible for the decisions at issue in this instant matter, including without limitation, the decision to induce McKesson to continue to allow Thrive to order products by promising to make sure McKesson would be paid but then not providing Thrive with the direction or ability to pay the amounts owed to McKesson.

## **JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states and the matter in controversy exceeds the sum value of $75,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the laws of this State and this Judicial District. Defendants are organized and existing under the laws of Delaware.

8.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District.

**GENERAL ALLEGATIONS**

**A.    Summit And Its Creation Of Thrive**

9.    Summit is a private equity investment firm with a focus on the healthcare & life sciences sector as well as the technology and growth products & services sections sectors and has assets under its management in excess of $37 billion.

10.    Upon information and belief, McKesson alleges that Ross D. Stern ("Stern") joined Summit in 2009 and is a Managing Director on Summit's Healthcare & Life Sciences Team.

11.    Upon information and belief, McKesson alleges that Darren Black ("Black") joined Summit in 2013 and is a Managing Director on Summit's Healthcare & Life Sciences Team.

12.    Upon information and belief, McKesson alleges that on or about April 26, 2016, Summit created Thrive to act as a holding company for other companies providing pediatric home care that Summit sought to acquire through Thrive.

13.    On Thrive's 2016 Foreign Limited Liability Company Application for Registration with the Commonwealth of Massachusetts, Thrive identifies Stern and Black as managers of Thrive. Stern and Black have consistently been listed as managers of Thrive on every annual report that Thrive has filed with the Commonwealth of Massachusetts since Thrive's inception.

14.    Upon information and belief, McKesson alleges that not only are Stern and Black managers of Thrive, they are also members of Thrive's board of directors.

15.    Upon information and belief, Summit directed Thrive to target the Subsidiaries for acquisition, or Summit directed Thrive to form or create the Subsidiaries.

16.    Upon information and belief, McKesson alleges that beginning in late 2016, Thrive, at Summit's direction, began in earnest to acquire numerous home health care companies including the acquisition of Dependable Nurses of Phoenix and Encompass Pediatric in November 2016; Advocate Pediatric Home Care in January 2017; We Care Kids Care, PLLC in February 2017; Continuum Pediatric Nursing and Trustient in May 2017; Genesis Pediatric Home Health in June 2017; and The Pediatric Connection in November 2017.

17.    Upon information and belief, McKesson alleges that Summit's push to grow the Thrive enterprise continued into 2018 with Thrive's purchase of Soft Touch Medical, LLC in February 2018; National Nursing & Rehab and Health & Home Services in June 2018; and FootPrints Home Care in July 2018. In addition to purchasing existing entities, upon information and belief, McKesson alleges that on or about August 9, 2018, Thrive, at Summit's direction, created Thrive DME-TX, LLC.

18.    Upon information and belief, McKesson alleges that Thrive's expansion continued into 2019 when it acquired Accessible Home Care in December 2019.

**B.    Thrive's Entry Into the Product Supply Agreement With McKesson**

19.    McKesson is a leading wholesale distributor of medical-surgical products and equipment and the provision of related goods and services.

20.    McKesson is informed and believes, and based thereon alleges, that Thrive both directly and through its locations, including Soft Touch Medical, LLC ("Soft Touch"),

Thrive DME-TX, LLC, and The Pediatric Connection, Inc. (the "Locations"), provide pediatric in-home care to patients including providing medical-surgical products, equipment, and nutrition.

21.    On or about June 1, 2018, McKesson, on the one hand, and Thrive, for itself and on behalf of its Locations, on the other hand, entered into a Product Supply Agreement wherein Thrive appointed McKesson as its prime distributor for itself and for the Locations (the "2018 PSA").

22.    Upon information and belief, McKesson alleges that in or around the beginning of Thrive's relationship with McKesson, Thrive, at Summit's direction, brought current the past due amounts owed by Soft Touch and The Pediatric Connection to McKesson.

23.    McKesson and Thrive have done business for many years preceding the specific transactions at issue in this suit following a common course of conduct. Under this business arrangement, McKesson agreed to sell or rent and deliver to Thrive's Locations, or directly to the homes of its patients, and Thrive directly and/or through its Locations agreed to purchase and accept from McKesson, medical-surgical products and equipment, nutritionals and general merchandise. These transactions were documented through purchase orders issued by Thrive directly and/or through its Locations and invoices issued by McKesson.

24.    When it needed product from McKesson, Thrive directly or through its Locations submitted purchase orders to McKesson detailing the type of goods and quantities it required. Such purchase orders were issued by Thrive directly or through its

6

Locations for each of the transactions at issue in this case. McKesson fulfilled the requests by delivering the goods to the Locations or directly to the homes of the Locations' patients along with providing invoices requesting payment of the goods.

25.     On or about July 1, 2020, McKesson, on the one hand, and Thrive, for itself and on behalf of its Locations, on the other hand, entered into a new Product Supply Agreement wherein Thrive again appointed McKesson as its prime distributor for itself and for the Locations (the "Product Supply Agreement"). The Product Supply Agreement contains confidential and proprietary information so that in the Product Supply Agreement, Thrive agreed to keep the terms of the Product Supply Agreement confidential.[1] The Product Supply Agreement replaced the then existing 2018 PSA.

26.     By virtue of the Product Supply Agreement, McKesson was the first choice supplier for the purchase of all medical-surgical products and equipment, nutritionals and general merchandise that Thrive and its Locations would normally purchase through medical-surgical distributors.

27.     Under the Product Supply Agreement, products were delivered to the Locations or directly to the homes of the patients for whom the Locations were providing home care services and Thrive was to pay for such product within ninety (90) days from the date of invoice. Further, Thrive agreed to unconditionally guarantee the performance of all obligations of any of the Locations identified in the Product Supply Agreement and any additional locations later added with McKesson's consent.

---

[1] Due to the confidential information in the Product Supply Agreement a copy is not attached to the Complaint however a copy will be made available to Defendants upon their request.

SECOND AMENDED COMPLAINT

28.    Thrive agreed to be bound by the Standard Terms and Conditions which included paying an interest charge of one and one-half percent (1.5%) per month on all past due balances.

29.    Moreover, Thrive agreed to pay McKesson for all reasonable attorneys' fees and expenses or costs that McKesson incurs for enforcement of its rights to collect amounts owed by Thrive.

30.    Furthermore, Thrive agreed that the Product Supply Agreement would be governed by and construed in accordance with the laws of the State of Minnesota.

**C.    Summit's Periodic Payment Of Thrive's Debt To McKesson**

31.    Upon information and belief, McKesson alleges that during the entire course of Thrive's relationship with McKesson, Summit would periodically step in to infuse Thrive with funding so that Summit, through Thrive, could bring Thrive's account with McKesson current including previously bringing the Soft Touch and The Pediatric Connection's previous past due balances current.

**D.    Thrive Breached The Product Supply Agreement By Failing To Pay For The Products.**

32.    Between June 2021 to September 2023, McKesson and Thrive either directly or through the Locations entered into a series of agreements evidenced by written invoices (each an "Invoice"; collectively, "Invoices"), whereby McKesson agreed to sell and Thrive directly and/or through the Locations agreed to purchase medical-surgical products and equipment, nutritionals and general merchandise or the rental of medical equipment (collectively, the "Products"). A true and correct copy of redacted exemplar Invoices are

8

attached hereto as **<u>Exhibit 1</u>**.[2] A statement of Thrive's account evidencing the Invoice numbers, dates, amounts due, due dates and services charges ("Statement of Account") is not attached due to its large size but McKesson agrees to provide a copy of the Statement of Account to Defendants directly on request.

33.    Between June 2021 to September 2023, McKesson shipped the Products to the Locations or directly to patients' homes pursuant to the Invoices, which were received and accepted in good condition, without objection, and without timely rejection or revocation of acceptance. The Invoices, along with the Product Supply Agreement, are hereinafter collectively referred as the "Invoice Agreements."

34.    In 2022, Thrive began to struggle with making timely payments to McKesson on the Invoices. In or around May 2022, McKesson began having regular calls with Thrive's executive management, namely Quinby Squire ("Squire"), Thrive's Senior Vice President, Chief Financial Officer and Treasurer and Esther Tinklenberg ("Tinklenberg"), Thrive's Senior Vice President Operations, HME, as well as Thrive's treasury and account payable representatives about Thrive's ongoing past due balance. Thrive requested some grace while it did some right sizing of its operations in an effort to increase its profitability. McKesson endeavored to be a good partner to Thrive to help it hopefully work through its challenges by allowing Thrive time to bring its account current. Thrive represented it would be back on track in October 2022, which was extended to November 2022 and then to January 2023.

---

[2] Confidential pricing information has been redacted from the exemplar Invoices. McKesson agrees to provide unredacted copies of the Invoices to Defendants directly on request.

SECOND AMENDED COMPLAINT

35.     During these calls Thrive represented that it was periodically receiving cash infusions from Summit to enable it to pay McKesson and other obligations.

36.     On November 17, 2022, Tinklenberg emailed McKesson acknowledging the amount of Thrive's outstanding debt and provided a proposed payment plan. While Thrive acknowledged the validity of the debt and the amount owed and agreed to numerous plans for repayment Thrive continued to falter on actually executing on the plans. However, Thrive repeatedly represented to McKesson that it was backed by Summit and that Summit would ensure Thrive had the funds to pay what was owed to McKesson.

37.     On December 12, 2022, Squire emailed Thrive's financials to McKesson – notably the filename for the 2022 financials she sent was "Copy of Financial Statements – Summit." When questioned Squire clarified that the filename "Summit Financials include the income statement, balance sheet and cash flow statements for Thrive as an organization."

38.     On December 23, 2022, McKesson received a payment of $520,000 for a portion of the Soft Touch outstanding balance. Upon information and belief, McKesson alleges that Summit facilitated that payment to McKesson with a cash infusion by Summit and was paid at Summit's direction.

39.     Over the course of the next several weeks Thrive promised that other payments would be made, but it failed to live up to its promises. By February 2023, Thrive's open balance had grown to over $6.1 million, including a past due balance of over $3.5 million.

SECOND AMENDED COMPLAINT

40.    On February 28, 2023, McKesson notified Thrive that Thrive's past due balance was too large and that Thrive had until March 9, 2023 to be within terms and pay the over $3.5 million in past due amounts or all accounts for Thrive would be placed on hold and no shipments would be released.

41.    Thrive advised McKesson that it would reach out to its managing director at Summit to discuss the situation and seek additional financing from Summit so that it could make the requested payment to McKesson. Thrive also requested more time before any shipping hold would be put in place by McKesson. McKesson advised Thrive that if it wanted McKesson to hold off on placing a shipping hold that it would need to receive assurances from Summit that the Thrive accounts would be paid.

42.    On March 8, 2023, Melinda Phillips ("Phillips"), Thrive's President and CEO, emailed McKesson stating that Thrive had been working with McKesson's collections department on a plan to reduce Thrive's overall balance with McKesson but that Thrive was struggling to do so as it had "a few large payors with large outstanding balances who are impacting [Thrive's] ability to pay down this McKesson balance more quickly." Phillips advised that a new CFO would be starting at Thrive on March 20 and that she needed to work with the CFO to develop a new plan to pay McKesson. She further stated that if McKesson insisted on Summit's involvement that Summit's managing director—who also sits on Thrive's board—was willing to get on a call with the McKesson CEO to discuss.

SECOND AMENDED COMPLAINT

**E.**     <u>**Summit Promises And Assures McKesson That Thrive's Debt Will Be Paid**</u>

43.     Shortly thereafter, Stern, who upon information and belief is both a manager and board member of Thrive and also a managing director of Summit, reached out to William Station ("Station"), McKesson's then Chief Financial Officer, and others at McKesson to discuss the situation.

44.     On March 11, 2023, Stern emailed Station stating that he wanted to "make sure that we resolve the situation at Thrive as soon as possible," that he wanted to assure Station that "Summit has a deep commitment to Thrive," and that "[f]rom an institutional perspective, the Summit relationship with McKesson is an important one given the breadth of our healthcare portfolio and so please trust that this situation is getting an appropriate level of attention internally."

45.     That same day, Stern forwarded his email to Station to Thomas Rodgers ("Rodgers"), McKesson's Executive Vice President and Chief Strategy and Business Development Officer. In his email to Rodgers, Stern explained that Summit was "working through an A/P issue with our portfolio company, Thrive, and the Med-Surg team at McKesson." Stern stated that he wanted to chat with Station to "find a resolution." He explained "Darren [Black] and I both sit on the Thrive board and the relationship with McKesson is very important to us."

46.     On March 13, 2023, Stern and Station spoke on the phone. After speaking with Stern, Station understood that Summit and Thrive were in agreement with regard to the amounts owed to McKesson and that Summit was going to ensure that the outstanding amounts Thrive owed to McKesson would be paid as well as the amount for any future

purchases. Based on Stern's commitment that Summit would ensure that the outstanding and future amounts would be paid, Station agreed to cause McKesson to temporarily forbear from placing a hold on Thrive's account so long as Thrive's past due balance stayed under $3.5 million to allow some additional time for Thrive, with Summit's backing, to propose an agreeable payment plan.

47.    Later that day, Phillips, Thrive's President and CEO, emailed Darrell Eakes ("Eakes"), McKesson's Vice President, Credit and AR Operations, acknowledging that Stern and Station had spoken and that Thrive was working to develop a payment plan as quickly as possible and that an agreement was reached that Thrive would need to keep its past due balance below $3.5 million.

48.    That evening, Stern followed up his call with Station by sending an email again confirming "the situation is getting the appropriate level of attention from Summit. Thrive's new CEO is starting next week, and so appreciate your flexibility on the timeline. Let us work on a firm plan once he is in seat and our teams can align on something that is mutually agreeable. I also passed along your feedback re: the $3.5M balance and the team understands."

## F.    **McKesson Relies On Summit's Promises And Summit Partially Performs On Its Promises**

49.    Between March 13, 2023 to March 15, 2023, Phillips, Thrive's President and CEO, exchanged numerous emails with McKesson regarding the outstanding balance owed to McKesson, acknowledging the amounts owed and restating Thrive's intention to pay those amounts to McKesson.

SECOND AMENDED COMPLAINT

50.     In reliance on Stern's representations about Summit's commitment to resolving the matter and with promises that Thrive was developing a plan with Summit's support to aggressively pay down its outstanding balance, McKesson held off on issuing a shipping hold on the Thrive accounts and continued to ship Products to the Thrive Locations.

51.     Upon information and belief, McKesson alleges that Summit provided Thrive with additional financing to keep the past due balance below the $3.5 million threshold for a period of time. Specifically, upon information and belief, McKesson alleges that Summit infused Thrive with enough cash to make the following payments to McKesson which occurred after Station's conversations with Stern. For example:

(a)     On March 14, 2023, Eakes emailed Phillips letting her know that Thrive's past due balance was over $3.5 million and needed to get below $3.5 million as agreed. On March 15, 2023, Thrive caused $162,451 to be sent to McKesson by ACH to get the past due balance below $3.5 million. Upon information and belief, McKesson alleges that Summit facilitated the payment to McKesson by providing Thrive with a cash infusion that allowed Thrive to make that ACH payment to McKesson and/or that the payment was made to McKesson at Summit's direction.

(b)     On March 23, 2023, Linda English ("English"), McKesson's Director, AR Collections-EC, sent an email to Tinklenberg, advising that Thrive's past due balance was $128,000 over the allow $3.5 million. On March 24, 2023, Thrive sent a payment of $220,000 to McKesson. Upon information and belief, McKesson alleges that Summit facilitated the payment to McKesson by providing Thrive with a cash infusion that allowed

14

Thrive to make that ACH payment to McKesson and/or that the payment was made to McKesson at Summit's direction.

(c)     On March 24, 2023, English sent an email to Tinklenberg notifying her that she ran an aging of everything due from Thrive through March 31, 2023 and that in order to adhere to the agreement to stay below $3.5 million Thrive would need to pay more than $178,000. On March 28, 2023, Chris Robbins ("Robbins"), Thrive's new Senior Vice President, Chief Financial Officer and Treasurer responded that Thrive processed a payment of over $225K to McKesson to keep the outstanding balance below the $3.5 million threshold. Upon information and belief, McKesson alleges that Summit facilitated the payment to McKesson by providing Thrive with a cash infusion that allowed Thrive to make that payment to McKesson and/or that the payment was made to McKesson at Summit's direction.

(d)     Upon information and belief, McKesson alleges that Summit continued to facilitate payments to McKesson by providing Thrive with periodic cash infusions that allowed Thrive to make partial payments to McKesson and/or the payments were made to McKesson at Summit's direction.

52.     Upon information and belief, McKesson alleges that Summit's control over Thrive and periodically infusing Thrive with funds to satisfy its obligations to McKesson was a practice that Summit utilized periodically during the entire course of Thrive's relationship with McKesson and it was reasonable for McKesson to rely on Summit, via Stern's, promises and assurances, that Summit would continue to provide Thrive with the funding to satisfy its obligations to McKesson.

SECOND AMENDED COMPLAINT

53.     Six weeks passed and McKesson still did not have a proposal from Thrive as to how it was going to bring its account current.

54.     On May 12, 2023, Station emailed Stern stating that he had asked his team to arrange a meeting with Stern and Thrive's CFO to discuss how Thrive could aggressively work to bring down its outstanding past due balance which was sitting well over $3 million. That same day Stern responded "[l]et me get with Chris Robbins at Thrive (new CFO) and will get this sorted out."

55.     On May 17, 2023, Robbins, the new CFO at Thrive, told McKesson that he would provide McKesson with a plan the following week after he meets with Stern however, no agreeable plan was presented to McKesson.

56.     On July 6, 2023, English sent an email to Robbins and others at Thrive notifying them that the past due balance was $3,643,084 which was greater than $3.5 million agreement reached with Station. English requested that Thrive address this immediately and requested a definitive plan to resolve the outstanding balance.

57.     On July 6, 2023, Robbins emailed that Thrive would be sending a $200K payment and would continue to "chip away at the delinquent balance" but that he was "still not yet in a position to provide a formal plan."

58.     On July 13, 2023, Station sent an email to Stern about the past due balance on the Summit/Thrive account. Station advised that McKesson was unable to continue to carry Thrive's large past due balance and would be updating McKesson's past due balance requirements.

16

SECOND AMENDED COMPLAINT

59.     On July 14, 2023, Stern thanked Station for his patience as Summit had been working through a difficult macro environment at Thrive. He further advised that he had let Robbins know that someone from McKesson would be "reaching out to align on plan and we are standing by."

60.     Upon information and belief, McKesson alleges that on or about July 20, 2023, English and others from McKesson had a call with Robbins and others from Thrive to discuss McKesson's past due balance requirements and Thrive's plan.

61.     On July 27, 2023, Station emailed Stern letting him know that he was "hearing some very concerning noise relative to Thrive and their past dues. It would be great if we can chat so I can understand how the outstanding debt will be covered."

62.     In or around July 27, 2023, McKesson began limiting shipments to Thrive and requiring prepayment for certain shipments and only releasing pending orders once payment was received.

63.     On July 28, 2023, Stern responded to Station's email and stated he received a call from Thrive's CEO about McKesson stopping shipments to Thrive. He asked that McKesson wait to take action until Station and him had an opportunity to connect and stated "you have my commitment that we will resolve this matter."

64.     Station responded that same day saying "[w]e need to quickly resolve the $6M owed to McKesson by Thrive. I can no longer support this level of debt." He provided Stern with his cell number so that they could talk. Despite the numerous promises and assurances made by Stern on behalf of Summit, payment was not received.

SECOND AMENDED COMPLAINT

65.     On August 4, 2023, Station emailed Stern as follows:

As you know from our prior discussions, Thrive Skilled Pediatrics Care, LLC ("Thrive SPC") has not paid McKesson Medical-Surgical ("McKesson") for certain services rendered and products delivered. The outstanding debt as of July 31, 2023 is $5,930,878. We have attempted to work with Summit Partners on a payment plan to bring Thrive outstanding debt current and, based on assurances made by you in March, April, and June 2023, McKesson continued to allow Thrive SPC to place orders with us. Despite repeated assurances of payment and a payment plan proposal, Thrive SPC has failed to pay down the outstanding debt and has failed to propose a payment plan to retire the debt.

Accordingly, until payment of $3M along with a signed payment plan for the remaining balance is received by McKesson, a hold is placed on any orders by Thrive SPC. . . .

## G.    <u>Summit's Marketing And Sale Of Soft Touch Medical</u>

66.     Unbeknownst to McKesson, McKesson is informed and believes and based thereon alleges that during late 2022 and early 2023 Summit was actively marketing at least Soft Touch Medical for sale which was the Thrive Location that brought in the most significant revenues for Thrive. Soft Touch was also the Thrive Location that had the largest outstanding balance with McKesson. Upon information and belief, McKesson alleges that Summit found a buyer for Soft Touch and sold it to Aveanna Healthcare with the purchase and sale transaction closing in or around August 1, 2023.

67.     Neither Summit nor Thrive informed McKesson of the impending sale of Soft Touch to Aveanna until a couple of days before the purchase and sale transaction was scheduled to close. Upon information and belief, McKesson alleges that the identified seller in that transaction was ostensibly Summit and that Summit took or applied the cash from the sale of Soft Touch for its own benefit.

18

68.     McKesson was shocked by Thrive's unexpected announcement of the sale of Soft Touch to Aveanna and Defendants' failure to satisfy at least the Soft Touch outstanding balance which neared $3 million alone. Had McKesson known that Soft Touch was in the process of being marketed for sale it never would have allowed Soft Touch to continue ordering products from McKesson on credit. Especially where upon information and belief McKesson alleges that the sale of Soft Touch was an asset sale leaving Soft Touch's existing liabilities with Thrive, including the Soft Touch past due amounts owed to McKesson, but leaving Thrive without Soft Touch as an ongoing source of revenue to pay the outstanding amounts due McKesson.

69.     From March 1, 2023 to August 1, 2023, Soft Touch purchased almost $3 million in Products from McKesson which Defendants have failed to pay despite the repeated promises and assurances from both of them that they would do so.

70.     Upon information and belief, McKesson alleges that it is no coincidence that Summit's promises and assurances of payment of Thrive's debt to McKesson occurred during the March 2023 to August 2023 period of time where Soft Touch was being actively marketed for sale and Soft Touch's ability to continue to purchase the Products from McKesson was critical to its ability to present itself as an ongoing concern.

71.     Upon information and belief, McKesson alleges that Summit's assurances that McKesson would be paid were calculated to facilitate Summit's sale of Soft Touch to be favorably completed to Summit's benefit and McKesson's detriment.

72.     Upon information and belief, McKesson alleges that Defendants were well aware that once Soft Touch was sold and without Summit's contributions Thrive would be

unable to satisfy its outstanding obligations to McKesson. Yet despite knowing that McKesson would be damaged Defendants induced McKesson to continue to allow Soft Touch to order products to McKesson's detriment.

73.    Upon information and belief, McKesson alleges that Thrive's failure to meet its payment obligations to McKesson were due to Summit's control over Thrive's finances and its direction as to how Thrive managed and paid or did not pay its ongoing obligations.

74.    Upon information and belief, McKesson alleges that Thrive had limited ability to obtain financing due to a lack of capitalization and Summit's substantial control over Thrive's affairs and decisions.

75.    Despite Stern/Summit's and Thrive's acknowledgement and agreement that Thrive owed the amounts to McKesson, Stern/Summit's representation that the matters involving the Thrive outstanding balance would be resolved, and McKesson's reliance on those statements to keep shipping products to Thrive, the outstanding balance remains unpaid.

76.    Thrive failed to pay the Invoices when due and is in breach of the terms of the Invoice Agreements. As a proximate result of Thrive's breach, McKesson has been damaged in an amount not less than $5,778,891.25.

77.    Although McKesson has demanded payment, Thrive and Summit have failed and refused—and continue to fail and to refuse—to pay McKesson the amount due and owing on the Invoices.

78.    There is now due, owing and unpaid to McKesson from Thrive the sum of $5,778,891.25, together with interest from the due date of each Invoice and other fees and

SECOND AMENDED COMPLAINT

charges pursuant to the terms of the Invoice Agreements, according to proof at time of trial or entry of judgment.

### H.    Summit's Operation And Use Of Thrive

79.    Upon information and belief, McKesson alleges that Summit is liable for Thrive's obligations to McKesson because Thrive and Summit operate as a single economic entity and it would unjust and unfair for Summit to avoid liability for McKesson's damages where Stern, Summit's managing director and Thrive's manager and board member, repeatedly represented to McKesson that Summit would ensure that McKesson was paid and pleaded for McKesson to continue to allow Thrive to order products from McKesson based on those assurances.

80.    Upon information and belief, McKesson alleges that Summit's and Thrive's relationship and interactions with McKesson display all of the indicia of two entities functioning as a single economic unit:

### (i)    Undercapitalization of Thrive

81.    Upon information and belief, McKesson alleges that it is evident from Thrive's inability to pay the outstanding amounts owed to McKesson that Thrive is insufficiently capitalized, despite its control by and through Summit.

### (ii)    Failure to observe corporate formalities

82.    As evidenced by the communications between Station and Stern, Summit repeatedly responded on issues relating to Thrive's failure to satisfy its payment obligations to McKesson. Upon information and belief, McKesson alleges that the principal decision makers at Thrive were the managing directors of Summit acting as board members and

managers of Thrive. Upon information and belief, McKesson alleges that Summit required Thrive's Chief Financial Officer to hold regular meetings with Stern where Stern would analyze Thrive's cash flow and determine whether Summit would infuse cash into Thrive to satisfy its cash flow needs. Upon information and belief, McKesson alleges that Stern and others at Summit, controlled Thrive's financial decisions including any payment plan that Thrive could propose to McKesson. Upon information and belief, Thrive's Chief Financial Officer had no ability to propose a plan for payment without first meeting with and involving Summit.

83.    Upon information and belief, McKesson alleges that Defendants' failure to observe corporate formalities is evidenced in the transaction with Aveanna for the sale of Soft Touch. Upon information and belief, the Aveanna transaction was orchestrated by Summit for the purpose of liquidating a Thrive asset so that Summit could directly benefit from that sale transaction.

84.    Upon information and belief, McKesson alleges that the evidence of Summit's direct involvement in the sale of Soft Touch is evidenced by the disclosure on the website for Edge Healthcare Partners ("Edge") at https://www.edgehcp.com/transactions where Edge describes Aveanna's purchase of Soft Touch Medical, Thrive Skilled Pediatric Care's GA HME Division but lists the Seller as Summit Partners with Edge's role as advisor for Aveanna.

SECOND AMENDED COMPLAINT

### (iii)    *Insolvency of Thrive*

85.    Upon information and belief, McKesson alleges that at all relevant times Thrive was insolvent, meaning that its liabilities exceeded the amount of its assets, and that if its liabilities all came due, it did not have sufficient assets to pay them.

86.    At a later time, Thrive's insolvency was confirmed when Thrive's representatives stated that Thrive did not have sufficient funds available to pay the past due amounts owed to McKesson when they came due.

### (iv)    *Summit's siphoning of funds from Thrive*

87.    Upon information and belief, McKesson alleges that Summit is certainly capable of capitalizing Thrive but intentionally under-capitalized it and instead has siphoned funds away from Thrive by selling Soft Touch which was the most significant revenue source to Thrive of the Locations indebted to McKesson, for the benefit of Summit and to the detriment of both Thrive and McKesson.

### (v)    *Summit's use of Thrive and its Locations as merely a façade for Summit's operations*

88.    Upon information and belief, McKesson alleges that at all relevant times Summit exercised domination and control over Thrive's finances. Upon information and belief, McKesson alleges that because Thrive had negative cash flow from its operations, Summit provided funding to Thrive to cover the operating expenses that Thrive could not cover from its revenues. Summit typically provided "just in time financing" for Thrive, only transferring money to Thrive as necessary to enable Thrive to pay its bills.

SECOND AMENDED COMPLAINT

89.    Upon information and belief, McKesson alleges that Summit exercised significant control over Thrive's operations, finances, and the ultimate decision to sell Soft Touch. Other indicia of Summit's exercise and control over Thrive is evidenced by how Thrive managed its affairs including referring to Thrive's financial as "Copy of Financial Statements – Summit."

90.    Upon information and belief, McKesson alleges that once the Soft Touch deal was finalized Summit made the strategic decision to starve Thrive of the critical funding it needed to pay its obligations despite repeatedly promising to McKesson that Thrive's debt would be resolved.

91.    Because Stern operated as an agent of Summit in connection with the promises and assurances of payment for Summit's and Thrive's benefit, and in connection with Summit's use of Thrive as its alter ego, Summit is jointly and severally liable with Thrive for $5,778,891.25, together with interest from the due date of each Invoice and other fees and charges pursuant to the terms of the Invoice Agreements, according to proof at time of trial or entry of judgment.

## I.    Conditions Precedent And Attorneys' Fees And Costs.

92.    All conditions precedent to the initiation of this lawsuit have occurred, been performed, or have been waived or excused.

93.    McKesson performed all of the promises, conditions and covenants it agreed to perform pursuant to the terms of the Invoice Agreements, except for those promises, conditions and covenants excused by the acts and omissions of Defendants.

SECOND AMENDED COMPLAINT

94.    The Product Supply Agreement provides that Thrive agrees to pay all reasonable attorney fees and expenses or costs incurred by McKesson in enforcing its rights to collect amounts due therefrom. McKesson has retained the law firm of Buchalter, A Professional Corporation and The Powell Firm, LLC and is entitled to reasonable attorneys' fees and costs incurred in prosecuting this action.

## FIRST CLAIM FOR RELIEF

### ALTER EGO

### (Against All Defendants)

95.    Plaintiff incorporates by reference all allegations contained in each preceding paragraph of the Complaint as if those allegations were fully set forth herein.

96.    As alleged above, at all relevant times herein, Summit, by its complete exercise of dominion and control, is the alter ego of Thrive, and each of the Thrive Locations, which constitute a single economic entity. Indeed, as set forth above, there is a high interdependency of operations; there is commonality between management, directors and officers; there is a consolidation of financial, strategic and other operations; and, at all relevant times, Summit has used and continues to use Thrive and Thrive's assets for its own purposes, to the detriment of Thrive and its creditors, including McKesson.

97.    An overall element of injustice is present because, Summit has wrongfully taken actions to induce McKesson as a creditor of Thrive to continue to allow Thrive to draw on its credit to the detriment of both Thrive and McKesson.

98.    For the foregoing reasons, the corporate veil of each of the Defendants should be disregarded and/or pierced rendering each of the Defendants jointly and severally

responsible and legally obligated for the payment of the all amounts owed to McKesson in this action.

## SECOND CLAIM FOR RELIEF

### BREACH OF WRITTEN CONTRACT

**(Against All Defendants)**

99.     Plaintiff incorporates by reference all allegations contained in each preceding paragraph of the Complaint as if those allegations were fully set forth herein

100.    On or about July l, 2020, McKesson and Thrive entered into the Product Supply Agreement pursuant to which McKesson was appointed as Thrive's prime distributor and Thrive agreed to have McKesson be its first choice for the purchase of all products normally purchased through medical-surgical distributors pursuant to the terms of the Product Supply Agreement.

101.    Between June 2021 and September 2023, McKesson and Thrive entered into a series of agreements evidenced by the Invoices whereby McKesson agreed to sell and Thrive agreed to purchase the Products identified in the Invoices.

102.    Between June 2021 and September 2023, McKesson shipped the Products to the Locations or directly to patients' homes pursuant to the Invoice Agreements.

103.    The Products were received and accepted and delivered by McKesson in good condition, without objection and without timely rejection or revocation of acceptance.

104.    Thrive breached the Invoice Agreements by failing to pay the Invoices for the Products when due.

SECOND AMENDED COMPLAINT

105.    As a proximate result of Thrive's breach, at Summit's direction, McKesson has been damaged in the amount of $5,778,891.25.

### THIRD CLAIM FOR RELIEF

### GOODS SOLD AND DELIVERED

### (Alternative Claim Against All Defendants)

106.    Plaintiff incorporates by reference all allegations contained in each preceding paragraph of the Complaint as if those allegations were fully set forth herein.

107.    Thrive became indebted to Plaintiff for goods sold and delivered to Thrive, its Locations, or its patients at Thrive's or its Locations' special request, and for which Thrive promised to pay $5,778,891.25.

108.    The whole of the said sum has not been paid, despite Plaintiff's demand therefor and there is now due, owing and unpaid from Defendants to Plaintiff the sum of not less than $5,778,891.25, together with service charges and interest at the legal rate, according to proof at time of trial of entry of judgment.

### FOURTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

### (Alternative Claim Against All Defendants)

109.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 94, inclusive, of the Complaint as if those allegations were set forth herein, with the exception of any allegation as to the existence of a contract between Thrive and McKesson.

110.    This is a count for unjust enrichment.

SECOND AMENDED COMPLAINT

111.    Defendants have been unjustly enriched at Plaintiff's expense.

112.    Defendants have been unjustly enriched because Plaintiff sold and delivered to Thrive, its Locations, or its patients at Thrive's or its Locations' special request certain Products as shown in the Invoices and Defendants agreed to pay therefore the sum of $5,778,891.25.

113.    Defendants knew consideration was being furnished and expenses were being incurred on its behalf by Plaintiff. Defendants also knew such consideration was being furnished and such expenses were being incurred by Plaintiff with the expectation of payment therefore.

114.    Defendants had knowledge of, accepted, and retained the benefit of the Products in the sum of $5,778,891.25.

115.    Defendants' action, in retaining those certain Products as shown in the Invoices without payment to Plaintiff constitutes an unjust enrichment to the Defendants which has accrued to the detriment of the Plaintiff.

116.    As a direct and proximate result of Defendants' wrongful acts and omissions as described herein, Plaintiff has been damaged in an amount to be determined at trial, but in no case less than $5,778,891.25, plus accrued interest from the date of default.

117.    There is no justification for this enrichment and impoverishment, and it is unjust for the law to permit such an enrichment.

118.    Should Plaintiff fail to prevail on its other claims for relief, there will be no other remedy at law to redress this unjust enrichment.

SECOND AMENDED COMPLAINT

119.    Plaintiff is therefore entitled to recover from Defendants the principal amount of $5,778,891.25, plus interest accruing at the legal rate until paid in full.

### FIFTH CLAIM FOR RELIEF

### ACCOUNT STATED

### (Alternative Claim Against All Defendants)

120.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 94, inclusive, of the Complaint as if those allegations were set forth herein, with the exception of any allegation as to the existence of a contract between Thrive and McKesson.

121.    Within the last three years, Thrive became indebted to McKesson because an account was stated in writing by and between Plaintiff and Defendant Thrive wherein it was agreed that said Thrive was indebted to Plaintiff in the sum of at least $5,778,891.25 for goods sold and delivered at Thrive's or its Locations' special insistence and request.

122.    Thrive directly or through its Locations submitted purchase orders to McKesson and McKesson issued corresponding Invoices that Thrive directly or through its Locations received, so Thrive both expressly agreed and impliedly promised to repay McKesson. McKesson rendered the Invoices and a Statement of Account to Thrive and Thrive did not object to the Invoices or Statement of Account. Moreover, Thrive, through its senior executives Squire (CFO), Tinklenberg (COO), Phillips (President & CEO), Stern (a manager and board member of Thrive and managing director at Summit) and representatives of Thrive's treasury and accounts payable teams, both in writing and verbally acknowledged that Thrive was indebted to McKesson in the amount demanded

SECOND AMENDED COMPLAINT

herein and represented that the entire sum owed to McKesson would be paid, but payment was never received.

123.    The whole of the above sum has not been paid, although demand therefor has been made. There is now due, owing and unpaid to Plaintiff from Defendants the sum of not less than $5,778,891.25, together with interest from the due date for each Invoice at the legal rate according to proof at time of trial or entry of judgment.

## SIXTH CLAIM FOR RELIEF

### QUANTUM MERUIT

### (Alternative Claim Against All Defendants)

124.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 94 above, as if those allegations were set forth herein, with the exception of any allegation as to the existence of a contract between Thrive and McKesson.

125.    Between June 2021 and September 2023, McKesson conferred a benefit on Defendants by delivering the Products to the Locations or directly to the homes of Thrive's patients.

126.    Defendants knew that McKesson conferred a benefit on Thrive by delivering the Products.

127.    In fact, delivery of McKesson's Products were accepted without objection, and without revocation of acceptance.  Further, on information and belief, the Products delivered by McKesson were used in Thrive's or its Locations' continuing business.

SECOND AMENDED COMPLAINT

128.   Under these circumstances, it would be inequitable and unfair if Defendants were not required to pay the fair and reasonable value for the Products, which at the time of sale was at least $5,778,891.25.

129.   The total reasonable value of the wrongfully retained Products is not less than $5,778,891.25, which reflects the amounts charged by McKesson for the Products that Thrive or its Locations retained without making payment.

## SEVENTH CLAIM FOR RELIEF

### PROMISSORY ESTOPPEL

### (Against Summit)

130.   Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 94 above, as if those allegations were set forth herein, with the exception of any allegation as to the existence of a contract between Defendants.

131.   Upon information and belief, McKesson alleges that at all times mentioned herein, Stern, was acting as the agent of Summit in its discussions with McKesson, and in doing or omitting to do the acts and things herein complied of, was acting within the course and scope of said agency, and/or that all of the said acts and/or omissions were authorized and/or ratified by Summit, and/or were done with Summit's knowledge and consent.

132.   Between March 2023 and August 2023, McKesson engaged in good faith negotiations with Thrive and Stern at Summit concerning Thrive's past due balance and McKesson's warning that it would place a hold on the shipment of products to Thrive if the past due balance was not paid. Summit, through its agent Stern, made unambiguous oral and written promises and assurances to McKesson that the amounts owed to McKesson

by Thrive would be paid and that as a result McKesson should not be worried about continuing to allow Thrive to order the Products and incur additional liabilities to McKesson.

133.    On behalf of Summit, Stern made clear he was making the promise as the managing director of Summit, which was the private equity investment fund controlling the operations of Thrive.

134.    In or about early March 2023, McKesson and Defendant Summit induced McKesson to refrain from taking any action to place a hold on Thrive's account which would stop the shipment of Products to Thrive and to allow Thrive to order Products from McKesson based on Summit's commitment that McKesson would be paid the past due balance that was due.

135.    Upon information and belief, McKesson alleges that Summit personally benefitted from this promise as convincing McKesson to continue to extend credit to Thrive and its Locations allowed Thrive, at Summit's direction, to keep Soft Touch operational so that it would be attractive to prospective purchasers, fulfilling Summit's goals of selling Soft Touch to Aveanna which was to Summit's economic advantage.

136.    Summit was in a position to fully perform, fulfill, and carry out the terms and conditions of the promise it made to McKesson.

137.    Upon information and belief, McKesson alleges that Summit partially performed its promise by providing Thrive with just enough financing to keep the past due balance below $3.5 million for a period of time but not enough to fulfill Summit's promise that Thrive's entire outstanding balance would be paid.

32

SECOND AMENDED COMPLAINT

138.    It was foreseeable that Summit's promise would cause or induce McKesson to act in reasonable reliance on Summit's promise.

139.    McKesson complied with the requests made to it by Summit and allowed Thrive to continue to order Products on credit.

140.    McKesson reasonably relied on Summit's promises and assurances to not place a hold on Thrive's account and for McKesson to continue to extend credit to Thrive to allow for the shipment of Products to Thrive, its Locations and/or the homes of the Locations' patients.

141.    McKesson is informed and believes and, on that basis alleges that Summit failed to inform McKesson that it would not be back stopping Thrive's obligations to McKesson and providing the additional funding that it needed to pay its outstanding obligations.

142.    As a result of McKesson's reliance, McKesson suffered a substantial change in position as the debt to Thrive continued to increase.

143.    Injustice can be avoided only by enforcement of Summit's promise.

144.    The unjust consequences of not enforcing Summit's promise are that McKesson has suffered damages in an amount to be proven at trial, including without limitation the loss of McKesson's benefit of the bargain under the promises made by Summit, the outstanding balance owed by Thrive to McKesson, and the attorneys' fees and costs of suit incurred by McKesson in pursuing this claim.

SECOND AMENDED COMPLAINT

## **EIGHTH CLAIM FOR RELIEF**

### **EQUITABLE ESTOPPEL**

#### **(Against Summit)**

145.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 94 and 130 through 144 above, as if those allegations were set forth herein, with the exception of any allegation as to the existence of a contract between Defendants.

146.    McKesson is informed and believes and, on that basis alleges that by making the promises and assurances alleged herein Summit intended that its conduct would be acted upon, namely that McKesson would refrain from taking any action to place a hold on Thrive's account, would not stop the shipment of Products to Thrive and would continue to allow Thrive to order Products from McKesson.

147.    Until Summit ultimately failed to fulfill its promises and assurances by ensuring that the obligations that Thrive owed McKesson were paid, McKesson was ignorant of the true state of facts, namely that Summit sought to induce McKesson to allow Thrive to get further into debt with McKesson without any intent by Summit to ensure that Thrive's debt to McKesson was satisfied.

148.    McKesson is informed and believes that as a result of Summit's actions, McKesson has suffered damages in an amount to be proven at trial, including without limitation, the loss of McKesson's benefit of the bargain under the promises made by Summit, the outstanding balance owed by Thrive to McKesson, and the attorneys' fees and costs of suit incurred by McKesson in pursuing this claim.

SECOND AMENDED COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, McKesson prays for judgment against Defendants as follows:

On the First Claim for Relief:

1.      A declaration that Thrive is an alter ego of Summit and therefore Summit is subject to joint and several liability for the amounts owed to McKesson herein;

On the Second Claim for Relief:

2.      For the sum of $5,778,891.25, together with interest and other fees and charges pursuant to the Invoice Agreements, according to proof at time of trial or entry of judgment;

3.      For reasonable attorneys' fees and expenses;

On the Third to Eighth Claims for Relief:

4.      For the sum of $5,778,891.25, together with interest at the legal rate according to proof at time of trial or entry of judgment;

5.      For reasonable attorneys' fees and expenses to the extent allowed by law;

On All Claims for Relief:

6.      For costs of suit herein incurred; and

7.      For such other and further legal and equitable relief, including pre-judgment and post-judgment interest, as the Court may deem just and proper.

/ / /

/ / /

/ / /

35

SECOND AMENDED COMPLAINT

DATED:  May 10, 2024                    Respectfully submitted,


                                        **THE POWELL FIRM, LLC**


                                        By:  /s/ Jason C. Powell
                                        Jason C. Powell *(Del. Bar No. 3768)*
                                        1813 N. Franklin Street
                                        P.O. Box 289
                                        Wilmington, DE 19899
                                        Telephone: (302) 650-1572
                                        Facsimile: (302) 650-1574
                                        JPowell@delawarefirm.com

                                        *And*


                                        **BUCHALTER**
                                        A Professional Corporation
                                        Joanne N. Davies (*Admitted Pro Hac Vice*)
                                        1420 Fifth Avenue, Suite 3100
                                        Seattle, WA 98101
                                        Telephone: 949.224.6221
                                        Email:  jdavies@buchalter.com

                                        Douglas P. Farr*
                                        60 E. South Temple Street, Suite 1200
                                        Salt Lake City, Utah  84111-1004
                                        Telephone: 801.401.8688
                                        Email:  dfarr@buchalter.com


                                        *Pro hac vice Forthcoming*

                                        Counsel for Plaintiff
                                        McKesson Medical-Surgical Minnesota Supply
                                        Inc.

BN 82526924v1

SECOND AMENDED COMPLAINT